1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Joseph M. Paunovich (Bar No. 228222)
2      joepaunovich@quinnemanuel.com
     William Odom (Bar No. 313428)
3      williamodom@quinnemanuel.com
4  865 S. Figueroa St., 10th Floor
   Los Angeles, California 90017-2543
5  Telephone: (213) 443-3000
   Fax: (213) 443-3100
6

7  Attorneys for Plaintiffs

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                        WESTERN DIVISION

11

12  | LIQWD, INC.; AND OLAPLEX, | Case No. 2:19-cv-5869 |
13  | LLC, | |
14  | | **COMPLAINT FOR TRADE SECRET MISAPPROPRIATION** |
15  |                     Plaintiffs, | |
16  | | **DEMAND FOR JURY TRIAL** |
17  |               vs. | |
18  | L'ORÉAL S.A., | |
19  | | |
20  |                     Defendant. | |
21

22

23

24

25

26

27

28

Plaintiffs Liqwd, Inc. ("Liqwd") and Olaplex, LLC ("Olaplex") (collectively, "Plaintiffs" or "Olaplex") bring this action against L'Oréal S.A. ("L'Oréal") for misappropriating Olaplex's trade secrets.

## NATURE OF THE ACTION

1.     L'Oréal is the world's largest beauty company and reported over $27 billion in revenue during its last fiscal year.

2.     A small California start-up called Olaplex discovered, developed, and eventually began selling a novel, game-changing hair care system to the professional hair care market.  One of Olaplex's products in the hair care system is the Olaplex Bond Multiplier No. 1 ("Bond Multiplier"), which protects, strengthens and repairs hair during bleach treatments, and has quickly become a favorite treatment of hair care professionals.  As of June 2019, hundreds of thousands of stylists in more than 80 countries have used Olaplex's product, and it is widely acclaimed to have revolutionized the hair care industry.

3.     The effect of using Olaplex's hair care system during bleach treatments is readily apparent from a side-by-side picture of bleached hair with and without Olaplex.  In the picture below, the left swatch of hair is an unprocessed color treated hair sample, the middle swatch of hair is the same color treated hair sample after being subjected to foil bleaching, rinsing, conditioning, and drying, and the right swatch of hair is the same color treated hair sample after foil bleaching with Olaplex Bond Multiplier added, rinsing, treating with Olaplex Bond Perfector (No. 2), rinsing, shampooing, conditioning, and drying.

COMPLAINT



4.     Bond Multiplier's remarkable performance and the extremely positive response of hair care professionals to the product spurred L'Oréal to approach Olaplex.  Under the guise of a potential acquisition of Olaplex, and under  non-disclosure agreements entered into between L'Oréal USA, Inc. and Olaplex, L'Oréal as a Representative of L'Oréal USA, Inc. received access to non-public, confidential, and proprietary information from Olaplex about its technology.

5.     After receiving Olaplex's confidential information, L'Oréal USA, Inc., directed by L'Oréal, ceased pursuing an acquisition of Olaplex.  Instead, L'Oréal willfully took and copied Olaplex's technology without authorization to create three "me too" knockoff three-step systems that are the subject of this action.

## PARTIES

6.     Plaintiff Liqwd is a California corporation, with its principal place of business in Santa Barbara, California.

7.     Plaintiff Olaplex is a California limited liability company, with its principal place of business in Santa Barbara, California.

8.     Defendant L'Oréal is a French corporation headquartered at Clichy, Hauts-de-Seine, France.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over Olaplex's federal law claims under 28 U.S.C. § 1331.  This Court has subject matter jurisdiction over Olaplex's state law claims based on complete diversity of citizenship under 28 U.S.C. § 1332(a)(2) because this civil action is between citizens of a state and citizens or subjects of a foreign state.  There is complete diversity between the parties, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00).  This Court also has supplemental subject matter jurisdiction over Olaplex's state law claims under 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over L'Oréal because L'Oréal, through its representatives and agents, deliberately conducted business in person within this state on at least May 19, 2015, including by being physically present in this state and by obtaining Olaplex's trade secret information in this state.  The instant lawsuit arises out of or relates to these transactions that occurred in this state. This Court also has personal jurisdiction over L'Oréal because L'Oréal, through its representatives and agents, is authorized to transact business within this state, has appointed a local agent for service of process, leases property within this state, has employees within this state, advertises within this state, maintains an office within this state, and maintains an interactive website accessible to residents of this state through which L'Oréal can and does conduct business with residents of this state.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and because L'Oréal is subject to personal jurisdiction with respect to this action in this judicial district.

## FACTUAL ALLEGATIONS

**Background**

12.     Olaplex is a small company based in Santa Barbara, California that develops professional hair care products.  Olaplex created the first successful and

effective product in the hair "bond building" market, and it is the world leader in that market.

13.    Bleaching is a common chemical treatment performed to lighten or remove color from hair, but it can be extremely harsh on hair.  It can give hair a straw-like texture with fragile hair fibers that break easily.  If bleach is allowed to stay on the hair for too long, it can cause hair to melt (disintegrate), or even to fall out.

14.    Protecting, strengthening and repairing damaged hair has long been a shared concern of hair care professionals and their clients.  Prior to the launch of the Olaplex, hair care professionals lived with the fear that bleaching could ruin their client's hair.

15.    Dean Christal grew up in the beauty business with his mother running a hair salon out of his childhood home, and his father was a distributor of beauty products in the Midwest.  Mr. Christal also gained experience in the haircare and beauty industries by working with his brother, Don Christal, who had founded Alterna Haircare and California Tan (sunless tanner).  With this background and an entrepreneurial spirit, Mr. Christal met Dr. Craig Hawker and Dr. Eric Pressly and urged them to tackle the holy grail of hair product development—figuring out how to keep chemical treatments from damaging hair.

16.    Working literally in Dr. Pressly's home garage, Drs. Hawker and Pressly came up with the revolutionary technology to protect hair during chemical treatments.

17.    This first-of-a-kind approach used a special "binding agent" or active ingredient to protect the hair during chemical treatments (like bleaching).  The active ingredient of the Bond Multiplier product is a chemical called "bis-aminopropyl diglycol dimaleate" and whose chemical structure is shown below:



### Olaplex's Patents

18.    Olaplex initially filed applications (and ultimately obtained patents) describing the dimaleate active ingredient used in the Bond Multiplier product.

19.    Recognizing the opportunity for unscrupulous competitors to copy Olaplex's proprietary technology and to use less expensive ingredients, Olaplex also obtained additional patents.

20.    Two of these additional patents are United States Patent Nos. 9,498,419 and 9,668,954 entitled "Keratin Treatment Formulations and Methods."  The '419 Patent was duly and legally issued by the United States Patent and Trademark Office on November 22, 2016.  The '954 Patent was duly and legally issued by the United States Patent and Trademark Office on June 6, 2017.

### Olaplex Pioneers Bond Building in 2014

21.    In early 2014, Olaplex was only available on a confidential basis to select premier hair colorists.  Among such premier hair colorists, Tracey Cunningham (a Redken Global Creative Consultant), Guy Tang (a social media superstar with more than a million followers online), and Riawna Capri (a celebrity stylist and co-owner of the Nine Zero One Salon in West Hollywood) began using Olaplex confidentially and without charge on their clients and friends (including celebrities like Jennifer Lopez and Gwyneth Paltrow), and also spreading the word about the "miracle product" Olaplex.

22.    In May 2014, Beauty Launchpad (a national trade magazine) published a one-page feature on Olaplex, entitled "The Power of One."  The article describes how Olaplex can be used to help hair when it is being lightened (bleached).  Ms.

Cunningham is quoted in the article explaining that, with Olaplex, "[y]ou still use your same hair color, your same products, your same technique, and your same shampoos and conditioners, but the hair is stronger and shinier."

23.     The first step ("No. 1") is the Bond Multiplier product that is used, for example, in lightening (bleaching) treatments.  The second step ("No. 2") is the "Bond Perfector" and is a cream that is applied after chemical processing of the hair and before it is shampooed and/or conditioned.  The third step ("No. 3") is the "Hair Perfector," and is designed for use in between repeated step 1 and 2 treatments.

24.     Olaplex formally launched in June 2014 via the Olaplex.com website. In the first month, customers placed more than 1,500 orders for Olaplex products. The next month, that number of orders nearly doubled.  More than 20,000 orders for Olaplex products were fulfilled on Olaplex.com alone in the first six months.  This success came at a time when Olaplex did not have any full-time employees.

25.     In November 2014, Olaplex launched in the United States with one of the largest wholesale salon and beauty supply distributors in the country, Salon Centric (a wholly-owned subsidiary of L'Oréal USA, Inc., which is in turn a wholly-owned subsidiary of Defendant L'Oréal).  Salon Centric opened some 100,000 accounts with Olaplex in the first six months.  Olaplex generated literally millions of dollars of sales for Salon Centric in that short period.

26.     Olaplex also has been the subject of numerous stories in leading national and international publications, such as Allure, Beauty Now, British Vogue, Cosmopolitan, Daily Mail, Elle, Fashion Quarterly, Glamour Russia, Harper's Bazaar, Huffington Post, Marie Claire, Modern Salon, MTV News, New York Magazine, New York Times, People Magazine, Pop Sugar, Refinery 29, U.S. Weekly, Vanity Fair Italia, Vogue Germany, Vogue India, Washingtonian, and Women's Health.  This partial list highlights the remarkable results that can be achieved with Olaplex's innovative professional hair care technology and the dramatic influence that Olaplex is having on the hair care industry.

27.     Today, Olaplex's hair care system has been used by hundreds of thousands of stylists across the globe, and continues to receive industry awards and rave reviews. In March 2015, Olaplex won the category "Favorite Color Innovation (Tool or Treatment)" at the 15th Annual Stylist Choice Awards.  At the 2016 Stylist Choice Awards, Olaplex was the winner of the "Favorite Product You Can't Live Without" category.

28.     Olaplex has an incredible presence and following on social media, with many of the top personalities in the entertainment industry showcasing their love of Olaplex.  Below are examples of un-solicited (independent) posts about Olaplex from celebrities Kim Kardashian West and supermodel Molly Sims:





**L'Oréal Receives Olaplex's Trade Secrets and then Ends Acquisition Talks**

29.     L'Oréal is in the business of selling, among other things, professional hair care products.  Despite its long history, L'Oréal never managed to successfully

create the holy grail of hair product development—figuring out how to keep chemical treatments (like lightening or bleaching) from damaging hair.

30.     As word spread about the Olaplex "miracle treatment" and as Olaplex's sales skyrocketed (including through L'Oréal's wholly-owned distributor, Salon Centric), L'Oréal became interested in learning more about Olaplex, the Olaplex products, and how they worked.

31.     In January 2015, Olaplex CEO Dean Christal and Paul Sharnsky, a senior vice president of Salon Centric, made contact regarding a potential acquisition of Olaplex by L'Oréal.

32.     On February 20, 2015, Mr. Christal attended a lunch meeting in New York City, that also included Bertrand Fontaine (President at Salon Centric – A Division of L'Oréal USA) and Frédéric Rozé (L'Oréal's Executive Vice President for the America's Zone) to discuss a potential acquisition of Olaplex by L'Oréal.

33.     On information and belief, L'Oréal CEO Jean-Paul Agon attended a meeting in New York City in early March 2015, at which he authorized L'Oréal's first efforts to obtain Olaplex's confidential and trade secret information by any means necessary under the pretense of a potential acquisition of Olaplex.

34.     On or about March 27, 2015, Mr. Christal, on L'Oréal's invitation, met in Paris with Hugo Kunetz (President Americas for L'Oréal PPD), An Verhulst-Santos (Director Professional Products at L'Oréal), and Nicolas Hieronimus (President, Selective Divisions L'Oréal), a trusted confidant of Mr. Agon, to discuss L'Oréal's potential acquisition of Olaplex.

35.     Unbeknownst to Dean Christal at the time, L'Oréal was secretly attempting to hire away Olaplex's key employees, whom L'Oréal knew were responsible for Olaplex's development.  Drs. Hawker and Pressly were both contacted by a L'Oréal "Talent Acquisition" manager in March 2015 under the pretense of seeking to discuss their backgrounds and potential opportunities at L'Oréal.  Drs. Hawker and Pressly did not respond to L'Oréal's secret overtures and

instead reported its efforts to Dean Christal.  Mr. Christal demanded that L'Oréal stop soliciting Olaplex's employees, including the inventors, if L'Oréal wanted to continue discussions with him regarding a potential acquisition of Olaplex.

36.    After L'Oréal provided Mr. Christal with such assurances, on April 14, 2015, Mr. Christal and Roger Dolden (SVP Business Development, L'Oréal USA, Inc.) met in Santa Monica, along with Mr. Sharnsky.  In addition to asking for access to Olaplex's intellectual property, financials, and marketing strategy, Mr. Dolden pressed for an in-person meeting with Olaplex's chemists (Drs. Hawker and Pressly).  In light of L'Oréal's previous secret attempts to recruit away Olaplex's inventors, Mr. Christal was not willing to provide any of Olaplex's confidential and trade secret information to L'Oréal without first securing protection in the form of a written non-disclosure agreement that would preclude all L'Oréal entities from attempting to obtain and use Olaplex's confidential and trade secret information for any reason other than to evaluate the potential acquisition of Olaplex.

37.    On May 13, 2015, Mr. Christal received an email from Mr. Dolden, attaching a proposed non-disclosure agreement ("NDA"), effective May 15, 2015, a preliminary list of due diligence requests, and a set of "illustrative talking points" for a forthcoming meeting between L'Oréal and Olaplex.  L'Oréal codenamed the potential Olaplex acquisition as "Project Olivia," and on occasion would use the term "Olivia" interchangeably with "Olaplex."  The talking points, which were prepared by Delphine Allard (L'Oréal's International Director of Research and Innovation), requested detailed technical information in order to "[b]etter understand the chemistry behind [Olaplex]."  L'Oréal specifically asked Olaplex to disclose Olalex's "mechanism of action [and] interaction with hair fiber."  L'Oréal also requested information about the "testing [Olaplex] did to develop/finalize the product," and the "tests [Olaplex] did to assess stability of their formula, specifically analytical stability of the active ingredient."

38.   L'Oréal USA, Inc. is the nominal counterparty to the NDAs executed with Liqwd and Olaplex.  However, L'Oréal USA, Inc. entered into the NDA not only on its own behalf, but also on behalf of all of its "subsidiaries, affiliates, and/or divisions."  L'Oréal S.A. is L'Oréal USA, Inc.'s affiliate.  Indeed, L'Oréal S.A. owns L'Oréal USA, Inc.  Specifically, the NDAs govern the use of Olaplex's "Confidential Information" by the following individuals and entities:

> We are interested in receiving certain non-public, confidential or proprietary information regarding LiQWD, Inc. (the "**Company**" or "**you**") in connection with a possible acquisition transaction of Olaplex LLC and/or the Company involving all or part of their  respective equity or assets (the "**Transaction**").  Any such information disclosed, whether in writing or orally or by any visual, magnetic, electronic (including by way of an on-line data room) or other medium, by or on behalf of the Company or any of its Representatives (as defined below) to us or any of our directors, officers, employees, affiliates, debt financing sources and advisors of such party and those of its subsidiaries, affiliates and/or divisions (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors) (collectively, "**Representatives**") in connection with such a Transaction is hereinafter referred to as the "**Confidential Information**".

39.   The NDAs contain "Restrictions on Disclosure and Use" of the Confidential Information Olaplex would provide to L'Oréal.  Specifically, L'Oréal agreed that it "will not disclose or permit our Representatives"—which, as discussed in the preceding paragraph, includes L'Oréal S.A.—"to disclose the Confidential Information to any person and will not use the Confidential Information for any purpose ***other than*** to evaluate, negotiate and, if applicable, consummate a possible Transaction . . . ."   In turn, the NDAs defined "Transaction" as "a possible acquisition transaction of Olaplex LLC and/or the Company involving all or part of their respective equity or assets . . . ."  Thus, the terms of the NDA served to preclude L'Oréal from using Olaplex's confidential and trade secret information for the development of competing products, or any purpose other than a potential acquisition deal.

40.   On or about May 15, 2015, the NDAs, which are attached hereto as **Exhibit A**, were executed and went into effect.

41.   On or about May 19, 2015, and pursuant to the NDAs, Olaplex provided to L'Oréal a copy of a then-unpublished patent application (Serial No. 14/713,885) describing the use of maleic acid during hair bleaching.   That application, which ultimately led to issuance of a parent patent to Olaplex's '419 and '954 Patents, disclosed to L'Oréal the active ingredient and formula that would ultimately form the basis of L'Oréal's "head start" in creating three knock off product lines.

42.   Just days prior to the May 19 meeting, Mr. Roger Dolden, EVP Mergers and Acquisitions for L'Oréal USA, requested that Mr. Christal provide information on Olaplex's technology, its efficacy, testing, intellectual property portfolio, and profit margin, amongst other things.   During the May 19 meeting, Mr. Christal and Dr. Pressly endeavored to share all the information on Olaplex's confidential and trade secret technology and business with Mr. Dolden, Mr. Kunetz, and Ms. Allard.

43.   Specifically, on May 19, 2015, Mr. Christal and Dr. Pressly met in person with several L'Oréal representatives, including Mr. Dolden, Mr. Kunetz, and Ms. Allard in Santa Monica, California.   At least one of these representatives, Ms. Allard—who was a L'Oréal S.A. employee—traveled from L'Oréal's offices in France to California with the express purpose of attending and participating in this meeting on behalf of L'Oréal S.A.   During the meeting, which lasted approximately 4 hours, Dr. Pressly provided L'Oréal with information requested in L'Oréal's "illustrative" talking points, including an in-depth explanation of how the Olaplex formulas work and what testing is needed to ensure efficacy.   The parties also discussed various financial items listed in L'Oréal's preliminary due diligence requests.

44.   At the May 19 meeting, L'Oréal representatives first met with Mr. Christal individually for approximately 1-2 hours, and then met with Mr. Christal and Dr. Pressly jointly for the remainder of the meeting to discuss the technology.

During the joint meeting with Mr. Christal and Dr. Pressly, L'Oréal's representatives had before them a binder with documents including Olaplex's patents and unpublished patent applications, and questioned Dr. Pressly extensively about Olaplex's confidential and trade secret technology and unpublished patent applications.   L'Oréal asked about Olaplex's patented and patent pending chemistries, whether the active ingredients were stable in the bottled product, and how Olaplex arrived at the ideal concentration of the active ingredient.  Testing was also a major focus of the discussion, with Dr. Pressly explaining the method and results of Olaplex's tensile tests, scanning electron microscope tests, and nuclear magnetic resonance tests.

45.    The May 19 meeting provided L'Oréal with a significant amount of trade secret and confidential information, all of which was provided to L'Oréal by Olaplex pursuant to the protections in the terms of the NDAs.

46.    Among other points, this trade secret and confidential information included the ideal concentration of Olaplex's active ingredients in a bond-building product, and the testing that was conducted to arrive at that calculation.  It also included disclosure of the fact that the results from the use of Olaplex's chemistries were substantially superior if there were two identical applications of product instead of just one (one application being the common practice in the industry). Olaplex explained the testing it conducted to arrive at the decision that one application would be insufficient and that three applications would lead to declining performance.  Olaplex also disclosed the most effective amount of time to leave the first and second applications in a client's hair and the testing it conducted to arrive at the conclusion.  Olaplex also disclosed the fact that using substantially more product than recommended in its directions reduced the product's effectiveness, because the product essentially self-interferes and starts cancelling out its benefit.

47.    The trade secret and confidential information disclosed to L'Oréal under the NDAs also included the scientific rationale for why the three-step process

for using Olaplex's chemistries (described above in Paragraph 46) is necessary. While the three-step process was not itself confidential — it was advertised in Olaplex's product literature — the scientific rationale for why this three-step process was necessary (and the scientific testing behind this rationale) *was* confidential.  Disclosure of this scientific rationale provided valuable information, by instructing L'Oréal as to why one could not create a more streamlined process that eliminated certain steps without reducing performance and efficacy.

48.    As noted above, the trade secret and confidential information provided to L'Oréal during the May 19 meeting also included important information about product testing.  For example, Olaplex informed L'Oréal how testing a bond-building product through nuclear magnetic resonance (NMR) testing was superior to testing it through tensile strength testing.  Olaplex also informed L'Oréal about the benefits of "speed-testing" the product on swatches of hair that were repeatedly washed over and over again, and how this sort of speed-testing was superior to the industry practice of longitudinally following individual clients over a period of weeks or months.  Olaplex also informed L'Oréal about the benefits of testing using unprocessed hair swatches donated from actual salon clients, as opposed to the industry practice of using pre-fabricated hair swatches with their cuticles stripped off.  All of this testing information was immensely valuable, given that a major impediment to commercializing any hair product is the time and effort involved in effectively testing the product.

49.    Between receiving the confidential, unpublished patent application that disclosed maleic acid as the active ingredient, and the additional confidential information provided by Dr. Pressly and Mr. Christal at the May 19 meeting, L'Oréal gained all the information needed to copy Olaplex's chemistry and bring a competitive product to market in a short span of time.

50.    Dr. Pressly's detailed explanation of Olaplex's testing results allowed L'Oréal to drastically reduce the amount of testing required, a process that can

easily take years (given that this was an entirely new category for L'Oréal to enter), requires significant resources, and costs a substantial amount of money.  At the time of the disclosure to L'Oréal under the NDAs, this information — the formula, the testing methodology and results (among other things) — was confidential and protected as trade secrets and subject to reasonable efforts by Olaplex to maintain the secrecy thereof.  Olaplex would not have disclosed this information to L'Oréal absent the NDAs, which L'Oréal violated by using Olaplex's confidential and trade secret information to develop its three knock-off product lines.

51.    L'Oréal's consideration of an Olaplex acquisition continued for a few months after the May 19 meeting.    In June 2015, Mr. Christal shared Olaplex's profit and loss statement with Mr. Dolden.

52.    During L'Oréal's assessment of Olaplex for potential acquisition, information was from time to time summarized and provided to the CEO of L'Oréal S.A., Mr. Jean-Paul Agon, who would review the information, provide feedback, and issue directions to L'Oréal S.A. employees, and also to employees of other L'Oréal subsidiary entities concerning Olaplex. Mr. Agon characterized the Olaplex innovation as a "must have" for L'Oréal, further indicating that it "would have been preferable to invent it ourselves" and recognizing that "now the choice is: either the [Research & Innovation] guarantee that it is able to develop an equivalent product within 12 months, [or] we have to buy it." *Liqwd, Inc. et al. v. L'Oreal USA, Inc. et al.*, No. 1:17-cv-00014-JFB-SRF, Dkt. No. 502, at 9 & n.5 (D. Del. Nov. 16, 2018). Minutes from a July 21, 2015 meeting among L'Oréal S.A. executives indicate that L'Oréal S.A's head of Research & Innovation, Mr. Laurent Attal, held "doubts about [L'Oréal's] ability to develop effective formulas" to imitate the Olaplex products. *Id.* at 9 & n.6.

53.    On information and belief, in or around the end of July 2015, L'Oréal decided not to acquire Olaplex, but rather to launch L'Oréal-branded bond builder products that would directly compete with Olaplex.

54.    On September 1, 2015, Mr. Dolden travelled to Los Angeles to meet with Mr. Christal for the stated purpose of discussing L'Oréal's acquisition of Olaplex.  At this meeting, Mr. Dolden informed Mr. Christal that L'Oréal was no longer interested in acquiring Olaplex.

**L'Oréal Willfully Copies Olaplex's Chemistry and its Three-Step System**

55.    After deciding not to acquire Olaplex, L'Oréal embarked on a scheme to create not one, but three, "me too" knock-off product lines that it hoped would mimic Olaplex's success and directly compete with Olaplex's products.  These "me too" products include Matrix Bond Ultim8 ("Bond Ultim8"), Redken pH-Bonder ("pH-Bonder"), and L'Oréal Professionnel Smartbond ("Smartbond") three-step systems. L'Oréal's Bond Ultim8, pH-Bonder, and Smartbond products are collectively referred to herein as the "L'Oréal Bond Builders."

56.    L'Oréal, without Olaplex's permission or authorization, and in direct contravention of the NDA's terms, wrongfully used Olaplex's confidential and trade secret information to develop and launch the L'Oréal Bond Builders.  L'Oréal gained significant benefit from the wrongful and unauthorized use of Olaplex's confidential and trade secret information, including gaining the ability to bring the L'Oréal Bond Builders to market in a much shorter timer period than would have been possible (if it were possible at all) for L'Oréal to develop its Bond Builders without use of Olaplex's confidential and trade secret information.

57.    After or around the time of the May 19 meeting, L'Oréal S.A.'s CEO, Jean-Paul Agon, sent an e-mail to other L'Oréal S.A. executives characterizing Olaplex as a "must have" innovation, indicating that "[i]t would have been preferable to invent it ourselves."  He continued: "Now the choice is: either the [Research & Innovation] guarantee that it is able to develop an equivalent product within 12 months, [or] we have to buy it." *Liqwd, Inc. et al. v. L'Oreal USA, Inc. et al.*, No. 1:17-cv-00014-JFB-SRF, Dkt. No. 502, at 9 & n.5 (D. Del. Nov. 16, 2018).

58.    At a July 21, 2015 meeting among L'Oréal S.A. executives, L'Oréal S.A.'s head of Research & Innovation, Laurent Attal, expressed "doubt about our ability to develop effective formulas," and offered a "consensus recommendation . . . to move forward and not to [make] non-binding offers to Olivia." *Id.* at 9 & n.6.

59.    Each line of the unauthorized L'Oréal Bond Builders that L'Oréal developed using Olaplex's confidential and trade secret information has three products (e.g., "steps") that are part of hair care systems (like Olaplex's system), which are described below.

60.    Based on its launch of these products, L'Oréal is uniquely positioned to harm Olaplex.  Since late 2014, a L'Oréal subsidiary (Salon Centric) has been a primary distributor of Olaplex in the United States.  Salon Centric had access to highly valuable insights and information about Olaplex (such as the identities of salon-level customers, order frequency, order amounts, customer feedback, and Olaplex's marketing and branding strategy).  That valuable commercial information provided a real-time insider's view of the success of Olaplex in the marketplace.  As a vertically integrated beauty company, L'Oréal also possesses product development and manufacturing entities.  These entities could use commercial information obtained by Salon Centric to copy Olaplex and to attempt to usurp its unique position in the marketplace in a way that other companies could not.

61.    For example, Salon Centric employees have been involved in efforts to promote the L'Oréal Bond Builders across the United States since their launch, which began in or around August 2016. In doing so, several employees have made statements to consumers that the Olaplex technology patent had "run up" or was expired, "it was only available for two years," and the "secret recipe" was available for any company to utilize in an effort to convince customers to switch from Olaplex to the L'Oréal Bond Builders or, in the case of first time bond builder customers, to buy the L'Oréal Bond Builders instead of Olaplex.

62.   In addition, L'Oréal copied the revolutionary three-step Olaplex system specifically to strengthen, protect and repair hair during and after professional bleaching treatments.   The marketing imagery produced by L'Oréal strongly resembles Olaplex's marketing materials, showing the product packaging in the background with the products lined up in front and somewhat off-center:



| ORIGINAL OLAPLEX | | |
|---|---|---|
| L'ORÉAL "ME TOO" KNOCKOFFS | | |
| Matrix Bond Ultim8 | Redken pH-Bonder | L'Oréal Professionnel Smartbond |

63.   Just like Olaplex (which has "No. 1", "No. 2" and "No. 3" products), the L'Oréal Bond Builders include three components.   Bond Ultim8 products are labeled 1, 2, and 3. pH-Bonder products are labeled 1, 2, and "Post-Service Perfector."   Smartbond products are labeled 1, 2 and "Conditioner" step 3.

64.   Just like Olaplex, each of the three L'Oréal Bond Builders is sold as a kit containing at least the "1" and "2" products for use in a professional hair salon. Just like Olaplex, each kit includes a dosing dispenser (a syringe in the Bond Ultim8

and pH-Bonder kits, and a cup in the Smartbond kit).  Just like Olaplex, L'Oréal sells the "step 3" or "Post-Service Perfector" products to maintain the benefits provided by the step 1 and 2 products.

65.    Olaplex is primarily sold in two different size kits. Olaplex calls the larger one the "Salon Intro Kit."  It calls the smaller one the "Travelling Stylist kit." Just like Olaplex, Bond Ultim8 and pH-Bonder are sold in two different size kits. Bond Ultim8 even uses similar names for its kits.  The larger one is called the "Salon Intro Kit" (exactly the same name that Olaplex uses) and a smaller one is called the "Travel Kit" (a very similar name to the one that Olaplex uses).

66.    The L'Oréal Bond Builders are direct competitors of Olaplex's three-step system in what is a two-player market for bond builders, as the District of Delaware and the Federal Circuit Court of Appeals have already found in connection with a lawsuit filed by plaintiffs against L'Oréal's subsidiary L'Oréal USA, Inc. and related entities.

67.    With Olaplex, hair care professionals use Olaplex's three-step system with clients to strengthen, protect and repair hair bonds during bleach treatments and reduce hair breakage.  The L'Oréal Bond Builders are aimed at the very same consumers.  The Bond Ultim8, pH-Bonder, and Smartbond three-step systems are sold to and used by hair care professionals to strengthen, protect and repair hair bonds during bleach treatments and reduce hair breakage.

68.    The L'Oréal Bond Builders are marketed to consumers as serving the same need as Olaplex's three-step system.  Since its launch, Olaplex has taught professional hair stylists that Olaplex's three-step system will allow them to lighten their client's hair without compromising the integrity of the hair.  L'Oréal employs very similar messaging with its L'Oréal Bond Builders, touting that they protect bonds during lightening, promote bond integrity during lightening, and strengthen and protect bonds/hair during lightening.

69.     Olaplex Bond Multiplier has four ingredients: water, the active ingredient (bis-aminopropyl diglycol dimaleate) and two preservatives (sodium benzoate and phenoxyethanol).

70.     The step 1 products of L'Oréal's Bond Builder systems have very similar ingredients.  Each of the step 1 L'Oréal Bond Builders has the following ingredients: water, the active ingredient (maleic acid), a buffering agent (ethanolamine), and three product dyes (CI 19140/Yellow 5, CI 14700/Red 4, CI 42090/Blue 1).  The Bond Ultim8 Step 1 Amplifier and pH-Bonder #1 Bond Protecting Additive have one additional ingredient: citric acid.  These steps of L'Oréal's Bond Builders are applied to hair with a bleaching formulation.

71.     Olaplex became known shortly after it was launched as "liquid gold" due to its unique golden yellow color, which is visible through its translucent bottle. L'Oréal's Bond Builders add three different dyes to achieve a color similar to the Olaplex Bond Multiplier No. 1 product.  The pictures below show the Bond Ultim8 Step 1 product (left) and Olaplex Bond Multiplier No. 1 (right) side-by-side and demonstrate the color similarity of the products in the bottles as used by hair care professionals:

 

72.     The instructions for using Olaplex's three-step system and the L'Oréal Bond Builders are also very similar.  For the step 1 products, the ratios of the product to the bleach used are virtually identical, and call for about 4 ml of the respective product for each 15 grams of lightening (bleach) powder:

| ORIGINAL OLAPLEX INSTRUCTIONS[1] | | |
|---|---|---|
| "For lightener in foils, add ¼ oz. (7.5ml) Olaplex No. 1 for 30-60g of lightener powder. For anything less, add ⅛ oz (3.75ml) Olaplex No. 1." | | |
| INSTRUCTIONS FOR L'ORÉAL "ME TOO" KNOCKOFFS | | |
| Matrix Bond Ultim8 | Redken pH-Bonder | L'Oréal Professionnel Smartbond |
| "LIGHTENER: add 4ml (⅛ oz) of STEP 1 for every 15–30 grams (½–1 oz) of powder or 8ml (¼ oz.) of BOND ULTIM8 STEP 1 for every 30–60 grams (1–2 oz) of powder used in the mixture …." | "For lightener, add 4 ml of pH-Bonder #1 for every 15–30 grams (½ – 1 oz) of powder or 8 ml of pH-Bonder #1 for every 30–60 grams (1 – 2 oz) of powder used in mixture …." | "For lightener product, add 4ml (.14 oz) of Step 1 additive for every 15-30 g (½-1 oz) or 8ml of Step 1 additive for every 30-60 g (1-2 oz) of lightening product used in the final mixture …." |

73.    Olaplex's step 2 product is a white "Bond Perfector No. 2" cream applied after chemical processing of the hair and before shampooing.  L'Oréal copied that, too, with the L'Oréal Bond Builders.  Matrix Bond Ultim8 "2" sealer, Redken pH-Bonder "fiber restorative pre-wash concentrate" "#2", and L'Oréal Professionnel Smart Bond pre-shampoo Step "2" are white creams applied after chemical processing of the hair and before it is shampooed and/or conditioned.

74.    Again, L'Oréal's instructions for these products instruct hair care professionals to use its pre-wash cream / pre-shampoo step 2 products in amounts and for times strikingly similar to Olaplex's step 2 product:

---

[1]    The written instructions for Olaplex changed in September 2016, and now instruct hair care professionals to use about half as much Bond Multiplier product during bleaching. L'Oréal copied the original Olaplex instructions dating back to just after the launch of the product (which are quoted throughout this Complaint), and L'Oréal has not yet updated its instructions to precisely match Olaplex's current instructions. (Although Olaplex changed its instructions, it was instructing users since late 2014 to use less Bond Multiplier product during bleach if they were not seeing appropriate lift (color lightening).

| ORIGINAL OLAPLEX INSTRUCTIONS | | |
|---|---|---|
| "Apply ½ oz (15 ml) of Bond Perfector from roots to ends. Comb thoroughly once. Leave on for a minimum of 5 minutes. For damaged hair, leave on for at least 10 minutes." | | |
| INSTRUCTIONS FOR L'ORÉAL "ME TOO" KNOCKOFFS | | |
| Matrix Bond Ultim8 | Redken pH-Bonder | L'Oréal Professionnel Smartbond |
| "Apply 15ml–30ml (½–1oz) of STEP 2 SEALER depending on length and density of hair. Leave on the hair for a minimum of 10 minutes …." | "Depending on hair length and density, apply 15-30 g of pH-Bonder #2 into hair from roots to ends. Gently comb through once. Leave on for 10 minutes at room temperature …." | "2. Depending on hair length and density, apply 4 to 8 pumps of Step 2 pre shampoo into hair from roots to ends. 3. Comb through once to evenly distribute. 4. Leave on for 10 min at room temperature …." |

75.     The third component in one of the L'Oréal three-step systems is the "Post-Service Perfector," which is used for maintenance in between repeated step 1 and 2 treatements. Each is white and copies the appearance of Olaplex's step 3 "Hair Perfector."  L'Oréal brazenly named the third component of its pH-Bonder product "Post-Service *Perfector*," again trying to benefit from the reputation of Olaplex's No. 3 "Hair *Perfector*" product.

76.     Olaplex instructs that its No. 3 Hair Perfector product should be used once a week and applied to unwashed towel-dried hair and left for at least 10 minutes.  L'Oréal copied these instructions from Olaplex too:

| ORIGINAL OLAPLEX INSTRUCTIONS | |
|---|---|
| "Apply a generous amount from roots to ends on unwashed towel-dried hair. Comb through once. Leave on for a minimum of 10 minutes or more." | |
| INSTRUCTIONS FOR L'ORÉAL "ME TOO" KNOCKOFFS | |
| Matrix Bond Ultim8 | Redken pH-Bonder |
| "To be used once a week. Before shampoo, apply on wet, towel-dried hair. Massage into hair from roots to ends. Leave on for at least 10 minutes …." | "Before shampoo, apply on wet, towel-dried hair. Massage into hair from roots to ends. Leave on for at least 10 minutes …." |

77.     L'Oréal started launching the L'Oréal Bond Builders in August 2016. L'Oréal did not inform Olaplex that it was planning to launch the L'Oréal Bond Builders in advance of making that information generally known to the market. Because L'Oréal closely guards information about its product development and planned product launches, Olaplex did not know, and could not have known, that L'Oréal was planning to launch the L'Oréal Bond Builders until that information became generally known to the market. Further, Olaplex did not know, and could not have known, the composition of the L'Oréal Bond Builders, including whether they incorporated Olaplex's confidential and trade secret information, until L'Oréal made that information public.

78.     Olaplex first became aware that L'Oréal was planning to launch its Bond Builders shortly before the first launch, on or around July 19, 2016.  Olaplex first discovered that the L'Oréal Bond Builders were based on, incorporated, used, and benefitted from Olaplex's confidential and trade secret information after becoming aware that L'Oréal was planning to launch its Bond Builders on or around July 19, 2016.

**Olaplex's Delaware Lawsuit**

79.     In early 2017, Olaplex filed a lawsuit against L'Oréal S.A., as well as several of its corporate affiliates, in the United States District Court for the District

-22-

of Delaware ("Delaware Court").  That case is currently pending as 1:17-cv-00014-JFB-SRF ("Delaware Lawsuit").

80.     L'Oréal S.A. was dismissed from the Delaware Lawsuit on the basis of a lack of personal jurisdiction. A final appealable order as to this jurisdictional ruling has not yet been entered in the Delaware Lawsuit.  Olaplex's pursuing legal remedies against L'Oréal S.A. in Delaware represents, at least, a good-faith effort to timely pursue its claims against L'Oréal S.A.  The Delaware Court ruled that Olaplex had done so in the wrong forum, and to the extent it is correct, Olaplex's time to reinitiate suit against L'Oréal S.A. is equitably tolled.  L'Oréal S.A. had notice of Olaplex's claims as early as the date the Delaware Lawsuit was filed.

81.     On February 28, 2018, the Delaware Court held that Olaplex had sufficiently pleaded and identified legally actionable trade secrets.  The publicly available version of that order is attached as **Exhibit B**.  Specifically, the Delaware Court concluded that Olaplex's unpublished patent application—provided to L'Oréal at the May 19 meeting—was adequately pleaded, identified and subject to trade secret protection. *See* Exhibit B at 29 (holding that Olaplex "adequately pleads trade secret misappropriation based on the unpublished patent application for the period between May 19, 2015 meeting where the unpublished application was disclosed, and the subsequent publication date of the applications.").  The Delaware Court further concluded that Olaplex's confidential information regarding its testing methodologies was also adequately pleaded, identified and subject to trade secret protection.  *See* Exhibit B at 31 (holding that Olaplex "adequately identifies the testing methodologies as trade secrets disclosed during the May 19, 2015 meeting.").

82.     On October 15, 2018, the Delaware Court issued a Report & Recommendation holding that Olaplex was entitled to a preliminary injunction restraining the remaining defendants from continuing to market and sell the L'Oréal Bond Builders, relying in part on its finding that Olaplex was likely to succeed on

1  the merits of its claims.   The publicly available version of that Report &
2  Recommendation is attached as **Exhibit C**.  On April 26, 2019, the Delaware Court
3  adopted the Report & Recommendation and ordered that a preliminary injunction
4  should issue.  The publicly available version of that Order is attached as **Exhibit D**.
5  On June 25, 2019, the Delaware Court issued an Order denying L'Oréal's motion
6  for summary judgment as to Olaplex's claims for misappropriation of trade secrets,
7  finding in connection with the 2015 acquisition discussions between the parties,
8  among other things, that: "It is clear that during the alleged negotiations that
9  plaintiffs shared substantial [trade secret] information by way of interrogatories;
10  documents; and their Rule 30(b)(6) witness with defendants about their products. …
11  After the May [19, 2015] meeting, L'Oréal developed products containing maleic
12  acid. In June 2015 defendants tested maleic acid and determined it performed well.
13  Thereafter, it began shifting to the use of maleic acid as an active agent. … The
14  Court finds that the Plaintiff has established sufficient facts to support a prima facia
15  trade secrets claim. … The plaintiffs have clearly identified trade secrets. The Court
16  finds there is substantial evidence that plaintiffs had trade secrets, including the
17  issues surrounding new uses of maleic acid and its testing methods."  The publicly
18  available version of that Order is attached as **Exhibit E**.

19  ## FIRST CAUSE OF ACTION
20  ### Misappropriation Of Trade Secrets (Federal Law)

21      83.   Olaplex realleges and incorporates herein by reference the allegations
22  contained in the preceding paragraphs.

23      84.   Olaplex owns the trade secrets described more fully in paragraphs 41-
24  50 (hereafter "Olaplex Trade Secrets"), which give Olaplex a significant
25  competitive advantage over would-be competitors, including L'Oréal.   This
26  advantage was compromised as a result of L'Oréal's unlawful activities.

27      85.   Olaplex invested substantial resources to develop the Olaplex Trade
28  Secrets, which derive independent economic value from not being generally known

COMPLAINT

to the public or to other persons who can obtain economic value from their disclosure or use.

86. Olaplex made reasonable efforts under the circumstances to maintain the confidentiality of its trade secrets.  Olaplex's efforts included, but are not limited to, (i) limiting the circulation of said materials within Olaplex; (ii) protecting, limiting, and controlling access to Olaplex properties with physical or electronic means; (iii) entering into NDAs prior to disclosing confidential information to L'Oréal.

87. Olaplex did not consent to the use of any of the Olaplex Trade Secrets by anyone other than authorized individuals using them for Olaplex's own business purposes.

88. L'Oréal has illegally obtained and used Olaplex Trade Secrets as set forth above and through other means of which Olaplex presently is unaware.

89. On information and belief, at all times L'Oréal knew or had reason to know that Olaplex Trade Secrets were obtained from Olaplex by improper means.

90. On information and belief, L'Oréal has used and disclosed Olaplex Trade Secrets without Olaplex's consent and without regard to Olaplex's rights, and without compensation, permission, or licenses for the benefit of themselves and others.  More specifically, L'Oréal has used these trade secrets in developing, marketing, and selling the L'Oréal Bond Builders.  L'Oréal's marketing and sale of the L'Oréal Bond Builders continues to the present day, meaning that L'Oréal's trade secret misappropriation continues to the present day.  Upon information and belief, Defendants are also continuing to further develop (*i.e.* improve) the L'Oréal Bond Builders, and thus its use of Olaplex's trade secrets in product development also continues to the present day.

91. L'Oréal used the Olaplex Trade Secrets to apply for, and obtain, U.S. Patent No. 10,058,494 ("the '494 Patent").  This patent embraces the Olaplex Trade Secrets, which L'Oréal misappropriated to obtain the patent, and thus the '494

Patent, and any related patents, patent applications and foreign counter-parts, must be assigned to Liqwd, Inc. (which holds all IP for Olaplex). *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1249-50 (Fed. Cir. 1989).

92.   As set forth in paragraphs 55-77, L'Oréal's conduct was, is, and remains willful and wanton, and was taken with blatant disregard for Olaplex's valid and enforceable rights.

93.   L'Oréal's wrongful conduct has caused and, unless enjoined by this Court, will continue in the future to cause irreparable injury to Olaplex.  Olaplex has no adequate remedy at law for such wrongs and injuries.  Moreover, paragraph 15 of the NDAs executed by the parties expressly provides that "money damages would not be a sufficient remedy for any breach," and that the non-breaching party "shall . . . be entitled to equity relief, including, without limitation, injunction or specific performance."   Olaplex is therefore entitled to an injunction restraining and enjoining L'Oréal and its agents, servants, officers, directors, and employees, and all persons acting there under, in concert with, or on their behalf, from further using in any manner Olaplex Trade Secrets.

94.   In addition, as a proximate result of L'Oréal's misconduct, Olaplex has suffered actual damages, and L'Oréal has been unjustly enriched.  Specifically, L'Oréal used Olaplex's trade secrets to gain an unfair advantage in the bond-building market, and the erosion of Olaplex's market-share position and pricing is a direct result of L'Oréal's trade secret misappropriation.

95.   L'Oréal's misappropriation of Olaplex Trade Secrets was willful and malicious; on information and belief, L'Oréal misappropriated Olaplex's Trade Secrets with the deliberate intent to injure Olaplex's business and improve its own.  Olaplex is therefore entitled to enhanced damages and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

## Trade Secret Misappropriation (California Law)

96.   Olaplex realleges and incorporates herein by reference the allegations contained in the preceding paragraphs.

97.   The Olaplex Trade Secrets gave Olaplex a significant competitive advantage over would-be competitors, including L'Oréal.   This advantage was compromised as a result of L'Oréal's unlawful activities.

98.   Olaplex invested substantial resources to develop the Olaplex Trade Secrets, which derive independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use.

99.   Olaplex made reasonable efforts under the circumstances to maintain the confidentiality of its trade secrets.  Olaplex's efforts included, but are not limited to, (i) limiting the circulation of said materials within Olaplex; (ii) protecting, limiting, and controlling access to Olaplex properties with physical or electronic means, and; (iii) entering into NDAs prior to disclosing confidential information to L'Oréal.

100.   Olaplex did not consent to the use of any of the Olaplex Trade Secrets by anyone other than authorized individuals using them for Olaplex's own business purposes.

101.   L'Oréal has illegally obtained and used Olaplex Trade Secrets as set forth above and through other means of which Olaplex presently is unaware.

102.   On information and belief, at all times L'Oréal knew or had reason to know that Olaplex Trade Secrets were obtained from Olaplex by improper means.

103.   On information and belief, L'Oréal has used and disclosed Olaplex Trade Secrets without Olaplex's consent and without regard to Olaplex's rights, and without compensation, permission, or licenses for the benefit of themselves and others.   More specifically, L'Oréal has used these trade secrets in developing, marketing, and selling the L'Oréal Bond Builders.  L'Oréal's marketing and sale of the   L'Oréal   Bond   Builders   continues,   such   that   L'Oréal's   trade   secret

misappropriation continues to the present day.   Upon information and belief, L'Oréal is also continuing to further develop (*i.e.* improve) the L'Oréal Bond Builders, and thus its use of Olaplex's trade secrets in product development also continues to the present day.

104.   L'Oréal's conduct was, is, and remains willful and wanton, and was taken with blatant disregard for Olaplex's valid and enforceable rights.

105.   L'Oréal's wrongful conduct has caused and, unless enjoined by this Court, will continue in the future to cause irreparable injury to Olaplex.  Olaplex has no adequate remedy at law for such wrongs and injuries.  Olaplex is therefore entitled to an injunction restraining and enjoining L'Oréal and its agents, servants, officers, directors, and employees, and all persons acting there under, in concert with, or on their behalf, from further using in any manner Olaplex Trade Secrets.

106.   In addition, as a proximate result of L'Oréal's misconduct, Olaplex has suffered actual damages, and L'Oréal has been unjustly enriched.   Specifically, L'Oréal used Olaplex's trade secrets to gain an unfair advantage in the bond-building market, and the erosion of Olaplex's market-share position and pricing is a direct result of L'Oréal's trade secret misappropriation.

107.   L'Oréal's misappropriation of Olaplex Trade Secrets was willful and malicious; on information and belief, L'Oréal misappropriated Olaplex's Trade Secrets with the deliberate intent to injure Olaplex's business and improve its own. Olaplex is therefore entitled to enhanced damages and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Liqwd, Inc. and Olaplex, LLC pray for a judgment against Defendant L'Oréal S.A. as follows:

1.   For damages in an amount to be proved at trial, together with interest thereon;

2.   For punitive damages in an amount to be proved at trial;

3.   For an award of reasonable attorneys' fees and costs incurred herein;

1    4.    For assignment of the '494 Patent, and any related patents, patent

2  applications and foreign counter-parts, to Liqwd, Inc.; and

3    5.    For any and all other relief the Court deems just and proper.

4

5  Dated:  July 8, 2019                Respectfully submitted,
                                       QUINN EMANUEL URQUHART &
6                                      SULLIVAN, LLP

7                                      By: /s Joseph M. Paunovich
                                            Joseph M. Paunovich
8                                           *Attorney for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

## **REQUEST FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues.

Dated:  July 8, 2019

Respectfully submitted,
QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: _/s Joseph M. Paunovich_
  Joseph M. Paunovich
  *Attorney for Plaintiffs*

-30-

COMPLAINT